**[Cite as *In re J.B.*, 2026-Ohio-2832.]**

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

IN RE J.B.                                    :
                                              :        No. 116113
[Appeal by R.B., Mother]            :

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 23, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD25908245

***Appearances:***

Christina M. Joliat, for *appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee*.

MARY J. BOYLE, J.:

{¶ 1} Appellant R.B. ("Mother") appeals the decision of the Cuyahoga County Juvenile Court terminating her parental rights and awarding permanent custody of her minor child, J.B., to the Cuyahoga County Division of Children and Family Services ("CCDCFS" or "agency"). Mother raises the following single assignment of error for review:

The trial court's order granting permanent custody to [CCDCFS] was premature and not based upon sufficient clear and convincing evidence and it erred in finding permanent custody to be in the best interest of the child.

{¶ 2} For the reasons set forth, we affirm the juvenile court's judgment.

## I. Facts and Procedural History

{¶ 3} In August 2025, CCDCFS filed a complaint for dependency and permanent custody, along with a motion for predispositional custody of J.B., who was two days old at the time.[1] CCDCFS alleged that Mother tested positive for "THC and cocaine during the pregnancy and delivery"; Mother has substance-abuse (alcohol, THC, cocaine, PCP) and mental-health issues (depression, anxiety, and post-traumatic stress disorder) that prevent her from providing appropriate care for J.B.; Mother does not have provisions to meet J.B.'s basic needs and has not maintained a sanitary home; Mother has another child who is committed to permanent custody of the agency "due in part to [Mother's] mental health, substance abuse and history of domestic violence with alleged father"; Mother had an unresolved criminal matter in Shaker Heights Municipal Court; alleged father failed to establish paternity; and alleged father has ten additional children that he does not support. (Complaint, Aug. 22, 2025.) The same day, the court granted the agency's motion for predispositional custody.

---

[1] We note that the agency captioned the motion as a "motion for pre-dispositional permanent custody," but in the motion the agency requested an order of "pre-dispositional temporary custody[.]" (Motion, Aug. 22, 2025.)

{¶ 4} In November 2025, the court held an adjudicatory hearing, at which the court adjudicated J.B. dependent. The court then proceeded to the dispositional hearing in December 2025. During this hearing, the court heard testimony from CCDCFS social worker Loretta Muhammad ("Muhammad"), who previously testified at the adjudicatory hearing, as well as from CCDCFS family advocate Catherine Barkley ("Barkley"). The court also incorporated the evidence from the adjudicatory hearing for purposes of disposition. The following evidence was adduced.

{¶ 5} On August 20, 2025, J.B. was born exposed to drugs. Mother tested positive at the hospital for cocaine and cannabis. According to Muhammad, Mother had two other children that have been placed into the "temporary and/or permanent custody" of the agency. Muhammad became involved with the family with the latter child since early 2024. (Tr. 10.) This child was placed in permanent custody of the agency in March 2025, which was while Mother was pregnant with J.B., because Mother tested positive at this child's birth for "marijuana, and . . . continued to test positive for marijuana, cocaine [and] admitted to doing ecstasy" and Mother failed to resolve her substance-abuse and mental-health issues (Tr. 11.) The agency offered Mother services to address the issues with the removal of this child, but Mother did not complete her case plan and her issues with her substance abuse, her mental health, her housing, and the history of domestic violence with alleged father were unresolved.

{¶ 6} With regard to J.B.'s case, Muhammad testified that Mother's case plan objectives included domestic-violence counseling, substance-abuse treatment, anger management, and mental-health treatment. As to substance abuse, Muhammad testified that Mother had issues with cocaine, marijuana, ecstasy, and PCP. Mother was referred to New Visions sometime around August 2025, but was dismissed from the program in either late September or early October 2025 for her failure to attend her required virtual sessions. Mother told Muhammad that she did not have internet service, so Muhammad offered that Mother go to the library instead. Mother, however, never went to the library because "she didn't have transportation, or it was too cold, or she just over slept." (Tr. 15.)

{¶ 7} Mother was also referred to Ethan's Crossing, where she completed her inpatient treatment the week prior to trial. According to Muhammad, while at Ethan's Crossing Mother had two physical altercations. After her completion from Ethan's Crossing, Mother was to enter intensive outpatient treatment. The agency made referrals to NORA, The Centers, and Ohio Guidestone, but nothing was set as of the time of trial. Muhammad testified that the agency asked Mother to submit to weekly random drug screening since the inception of this case, but her compliance with these requests has been "[l]ittle to none." (Tr. 19.) Mother did not attend the screenings, claiming to have transportation issues. The agency provided Mother with bus tickets to alleviate the transportation issue, but Mother still failed to submit to the screenings.

{¶ 8} The last screening Mother submitted to was in early November when she was admitted to Ethan's Crossing. Mother tested positive for cocaine at this screening. Mother also tested positive for cocaine and marijuana at a prior drug screen in September 2025. Despite these positive results, Mother denied drug use and claimed that "[s]omebody put [the drugs] down there [in her private area and] . . . that's how they got into her system." (Tr. 73.) Muhammad further testified that Mother failed to complete the drug screen scheduled the week prior to trial, and a sobriety date had not been established at of the time of trial. When asked if Mother has overcome her addiction issues, Muhammad replied, "No, she has not." (Tr. 29.)

{¶ 9} As to the domestic violence portion of her case plan, Muhammad testified that Mother failed to complete the domestic violence referral and was discharged for nonattendance. Mother was also to complete anger management services through Action Recovery. She started the services, but did not complete that program. According to Muhammad, Mother's failure to complete the anger management portion of the case plan was a concern because Mother "can go from zero to one hundred in the blink of an eye. . . . [Mother] has cussed the Agency staff out. . . . [Mother] . . . has gotten put out at Hitchcock for Women because she threatened to kill someone. . . . [Muhammad has] text messages of [Mother] being rude and disrespectful to her as an Agency staff[.]" (Tr. 53.)

{¶ 10} Muhammad also testified to the mental health objectives in Mother's case plan. According to Muhammad, Mother's mental health history includes diagnoses of "depression, bipolar disorder, current episode manic severe with

psychotic features, suicide attempt by beta blocker overdose, post traumatic stress disorder, bipolar one disorder, cannabis use, substance included mood disorder, major depressive order, attention deficit hyperactivity disorder, [and] oppositional defiance disorder." (Tr. 12-13.) Mother has admitted these diagnoses to Muhammad and was referred to New Visions and The Centers for mental health services. Mother started her services at New Visions, but was dismissed for nonattendance. Muhammad testified that while Mother participated in some mental health services at Ethan's Crossing, Muhammad has not observed an improvement in Mother's mental health and was concerned about Mother's depression. Muhammad testified, Mother "has her moments to where she's okay, and then it'll just, out of the blue, she'll just have a depressive moment to where she can't function. One of the most recent that [Muhammad] remember[ed] [was] before [Mother] went into Ethan's Crossing, she canceled her visit because she had a depressive moment." (Tr. 28.)

{¶ 11} With regard to Mother's home, Muhammad described it as unfit for any child to live there, with "trash overflowing in the can. Pizza boxes, cigarette butt[s], clothes in the bathroom on the floor, dishes in the sink, the refrigerator wasn't cleaned." (Tr. 13.) The condition of Mother's home has been a concern since Muhammad was first involved in 2024. The last time Muhammad had access to Mother's home was in October 2025, which according to Muhammad "was still not clean enough for a child to be there." (Tr. 45.) Mother advised Muhammad that she

has been avoiding her residence because she is tempted to engage in substance abuse when she is there.

{¶ 12} When asked if Mother was close to completing her case plan services, Muhammad stated, "no." (Tr. 32.) Muhammad could not put a time frame as to when the case plan would be completed because "time isn't of [Mother's] essence." (Tr. 32.) Muhammed explained, when Mother is "given a task, she does it in her own pace[.]" (Tr. 33.) Muhammad also stated that she did not believe that Mother would complete her case plan if the case were extended because Mother was "given the opportunity to complete the same case plan goals when she had [the other child], and it continued over to [J.B.]. And [Mother] has not taken the opportunity or taking things serious enough to extend it because this is a pattern that [Mother] has had since [she] . . . has been dealing with [Mother] and her children." (Tr. 62.) Furthermore, the agency had concerns with "the unstableness of [Mother's] mental health, her anger management, the cleanliness of her home, and also, [Mother] doesn't have any income at this point." (Tr. 52.) Additionally, Mother has outstanding warrants for criminal cases in the Shaker Heights Municipal Court.

{¶ 13} Muhammad testified to Mother's visits with J.B. Mother first visited J.B. on September 4, 2025, but failed to visit the following week on September 12, 2025, despite having been given bus tickets to address her transportation issues. At the October 3, 2025 visit, Mother left three-month-old J.B. lying on a couch while she went to the restroom. Mother attended her October 10th visit, but missed the visit with J.B. on October 17, 2025. Mother stated that she "just had a mental

breakdown" and could not attend. (Tr. 39.) Mother also missed the next two visits with J.B. in October. Muhammad testified that when Mother visited with J.B., she generally behaved appropriately with J.B. but did make J.B. cry at every visit because she would clean J.B.'s nose with her fingernail.

{¶ 14} Muhammed further testified that the agency's attempts to identify an appropriate relative caregiver for J.B. during the pendency of the proceedings were unsuccessful. J.B. had been in the same placement since she left the hospital in August 2025, and has bonded with her foster family, with whom she is thriving.

{¶ 15} Barkley testified that she had been involved with Mother for about two years at the time of trial. As a family advocate, she assisted Mother with her treatment and weekly drug screens. Barkley expressed the same concerns as Muhammad regarding Mother and testified that Mother was not consistent with her drug screens.

{¶ 16} With regard to the alleged father, Muhammad testified that he had not engaged with the agency, did not establish paternity for J.B., and had a history of criminal convictions involving drugs and violence. Alleged father told Muhammad he wanted no involvement with CCDCFS. Muhammad could not confirm or deny if alleged father has ten other children as alleged in the complaint. She testified that she knew it was more than seven children.

{¶ 17} After the agency rested its case, no further witnesses were called. The guardian ad litem ("GAL") then affirmed the recommendation in her written report, in which she indicated that she supported permanent custody for J.B. unless it could

be demonstrated at the dispositional hearing that Mother "is currently participating in case plan services . . . for her substance abuse [and] mental health and is making progress in her steps toward reunification." (GAL report, Oct. 31, 2025.)

{¶ 18} Following the conclusion of the dispositional hearing, the juvenile court issued a decision terminating Mother and alleged father's parental rights and finding that it was in J.B.'s best interest to be placed in the permanent custody of CCDCFS for purposes of adoption. In its judgment entry, the court, citing to R.C. 2151.353(A)(4), found by clear and convincing evidence that J.B. cannot be placed with either parent within a reasonable time or should not be placed with her parents.

{¶ 19} The court also determined that several R.C. 2151.414(E) factors exist, including subsections: (E)(1) (Mother has failed continuously and repeatedly to substantially remedy the conditions causing J.B. to be placed outside her home); (E)(2) (chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes Mother unable to provide an adequate permanent home for J.B.); (E)(4) (Mother has demonstrated a lack of commitment toward J.B.); and (E)(11) (Mother has had parental rights involuntarily terminated with respect to J.B's sibling). The court further found that Mother has

> failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of [J.B.].

CCDCFS has been working with the family since 2024. [Mother] has the following issues: achieving and maintaining sobriety, mental health, housing, and anger management. [Mother] was referred to Action Recovery, Hitchcock and The Centers for substance abuse and mental health on the sibling's case but did not complete any of the programs. In this case, she has been referred to New Visions and Ethan's Crossing but has not completed any programming. A urine screen was requested on December 11, 2025, but [Mother] did not provide a screen. [Mother] has no sobriety date.

[Mother] does not have appropriate housing. [Mother] stated it was a struggle for her to be in her building due to the temptation to use and because it is not clean.

Paternity has not been established. The alleged father refused contact with the agency and has refused any services.

[J.B.] has been in custody since her release from the hospital following her birth. She does not have special needs. Her foster family is willing to adopt her.

(Journal entry, Jan. 12, 2026.)

{¶ 20} It is from this order that Mother now appeals, raising one assignment of error for review.

## II. Law and Analysis

{¶ 21} In her sole assignment of error, Mother challenges the juvenile court's permanent custody award to the agency. Mother argues that the juvenile court's decision to terminate her parental rights and grant permanent custody of J.B. to the agency was against the manifest weight of the evidence and the court's decision was not in J.B.'s best interest because she has engaged in her case plan services. She maintains that she has bonded with J.B. and the denial of permanent custody would allow her time reengage and complete her mental-health and substance abuse services.

{¶ 22} We note that Mother has failed to cite to the record on which she relies as required by App.R. 16(A)(7), which requires "[a]n argument containing the contentions of the Mother with respect to each assignment of error presented for review and the reasons in support of contentions, with citations to the authorities, statutes, and parts of the record on which Mother relies." App.R. 12(A)(2) permits the court to disregard an assignment of error if the party raising it fails to comply with the requirements of App.R. 16(A). However, in the interest of justice we will address her argument.

## A. Standard of Review

{¶ 23} At the outset, we recognize that the right to raise one's own child is "an 'essential' and 'basic civil right.'" *In re Murray*, 52 Ohio St.3d 155, 156 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651 (1972). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). This right, however, is not absolute. "'The natural rights of a parent are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App. 1974).

{¶ 24} The Ohio Supreme Court has provided guidance on the standard of review in permanent custody cases. The Court held:

> [T]he proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-

of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments presented by the parties.

*In re Z.C.*, 2023-Ohio-4703, ¶ 18.

{¶ 25} While Mother mentions sufficient evidence in her assigned error, Mother only bases her arguments on the manifest-weight-of-the-evidence standard. The *In re Z.C.* Court reexplained this standard as follows:

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

## B. Permanent Custody

{¶ 26} An agency may obtain permanent custody of a child in two ways: first by obtaining temporary custody of the child and then filing a motion for permanent custody under R.C. 2151.413, or second, by requesting permanent custody as part of its original abuse, neglect, or dependency complaint under R.C. 2151.353(A)(4). *In*

*re A.R.*, 2020-Ohio-5005, ¶ 30 (8th Dist.), citing *In re E.P.*, 2010-Ohio-2761, ¶ 22 (12th Dist.).

{¶ 27} Here, CCDCFS specifically requested permanent custody of J.B. in the dependency complaint. We note that the agency did not include any reference to R.C. 2151.353(A)(4) in the complaint. The juvenile court, however, did rely on R.C. 2151.353(A)(4) in its journal entry ordering permanent custody. As a result, our analysis will proceed under R.C. 2151.353(A)(4).

{¶ 28} When proceeding on a complaint with an original dispositional request for permanent custody under R.C. 2151.353(A)(4), there are two requirements the trial court must satisfy before it may order the child placed into permanent custody. *In re A.R.* at ¶ 31. First, the trial court must find by clear and convincing evidence "'that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent,'" as set forth in R.C. 2151.414(E). *Id.*, quoting R.C. 2151.414(E); *see also In re B.M.*, 2021-Ohio-1196, ¶ 9 (8th Dist.). Second, the court must determine, by clear and convincing evidence that "'permanent commitment is in the best interest of the child,'" as set forth in R.C. 2151.414(D)(1). *Id.*, quoting R.C. 2151.414(D)(1); *see also In re B.M.* at ¶ 9.

{¶ 29} "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to

the facts sought to be established.'" *In re Z.C.* at ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

### 1. First Prong — R.C. 2151.414(E)

{¶ 30} When determining whether a child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either of the parents, the court must consider the factors set forth in R.C. 2151.414(E). In this case, the court found that the factors specified in R.C. 2151.414(E)(1), (2), (4), and (11) applied to Mother:

> (E)(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> (E)(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
>
> . . .
>
> (E)(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

. . .

(E)(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

{¶ 31} A court need only find one of these factors is met to make a finding that the child could not or should not be placed with the parent. *In re Ca.T.*, 2020-Ohio-579, ¶ 27 (8th Dist.), citing *In re V.C.*, 2015-Ohio-4991, ¶ 42 (8th Dist.). Here, Mother only challenges the court's findings under R.C. 2151.414(E)(1) and does not challenge the court's findings under (E)(2), (4), and (11). Therefore, our focus is on R.C. 2151.414(E)(1).

{¶ 32} Mother contends she completed inpatient substance abuse and has a plan for recovery housing and mental health services. Mother's contention, however, is undermined by the trial testimony, which established that she was dismissed from the New Visions treatment program in September 2025 because of her failure to attend her virtual sessions as required, she did not enter intensive outpatient treatment, she failed to submit to the weekly drug screens as requested, when she did submit to testing, she tested positive for cocaine and marijuana in September 2025, and positive for cocaine in November 2025, she failed to meaningfully engage in mental health services as referred, and failed to complete domestic violence and anger management services as referred.

{¶ 33} Despite this, Mother requests the opportunity for more time to engage in the case plan services. Contrary to Mother's assertion, the agency has given her this opportunity, but Mother failed to avail herself to the services. Moreover, the juvenile court was not required to maintain J.B. in temporary custody to afford Mother additional time to do what she had failed to do in the two years since her initial involvement with the agency regarding her other child and in the months following J.B.'s removal. *In re J.F.*, 2024-Ohio-3311, ¶ 22 (8th Dist.) (rejecting a similar claim, noting that "there is no requirement that the trial court delay proceedings" and mother's history with the agency demonstrated a failure to address her substance abuse and mental health concerns.)

{¶ 34} Here, the evidence in the record demonstrates that J.B. was removed at birth because the substance abuse and mental health issues, which already led to the termination of Mother's parental rights regarding J.B.'s older sibling. Mother lost permanent custody of this child in March 2025, which was while she was pregnant with J.B. Following J.B.'s removal, Mother was referred to services to address her unresolved issues, but she failed to fully engage in or complete services. Mother also failed to consistently submit to the weekly drug screens and had no established sobriety date. Furthermore, Mother failed to meaningfully engage in mental health services and failed to demonstrate benefit from her participation in those services. Lastly, Mother failed to complete the domestic violence and anger management services as referred.

{¶ 35} Moreover, Muhammad did not believe that Mother was close to completing her case plan services and could not put a time frame as to when the case plan would be completed because "time isn't of [Mother's] essence." (Tr. 32.) Muhammad also did not believe that Mother would complete her case plan if the case were extended, explaining that Mother "has been given the opportunity to complete the same case plan goals when she had [the other child], and it continued over to [J.B.]. And [Mother] has not taken the opportunity or taking things serious enough to extend it because this is a pattern that [Mother] has had since [she] . . . has been dealing with [Mother] and her children." (Tr. 62.)

{¶ 36} Based on the foregoing, there was clear and convincing evidence in the record to support the juvenile court's finding under R.C. 2151.414(E)(1), and that finding was not against the manifest weight of the evidence. Accordingly, the juvenile court properly found that J.B. could not or should not be placed with Mother within a reasonable time.

{¶ 37} Having found that the juvenile court properly determined that at least one of the R.C. 2151.414(E) factors applies by clear and convincing evidence, we must next determine whether the juvenile court appropriately found by clear and convincing evidence that granting permanent custody to CCDCFS is in J.B.'s best interest under R.C. 2151.414(D).

## 2. Second Prong — Best Interest Determination under R.C. 2151.414(D)

{¶ 38} In order to find by clear and convincing evidence that granting permanent custody to the agency is in the best interest of the child, the court must consider all the following factors, including, but not limited to the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a)-(e).

{¶ 39} Here the juvenile court found that R.C. 2151.414(D)(1)(b), (d), and (e) apply. Regarding subsection (D)(1)(b), the court noted that J.B. "is too young to express wishes, but her GAL recommends that permanent custody is in her best interest." (Journal entry, Jan. 12, 2026.) As to subsection(D)(1)(d), the court stated

that this "factor weigh[ed] in favor of permanent custody. The Court finds that neither parent is nor will be in a position to take custody of [J.B.]." (Journal entry, Jan. 12, 2026.) Lastly, with regard to subsection (D)(1)(e), the court found that this "factor weigh[ed] very heavily in favor of permanent custody as a sibling of [J.B.] was placed in the permanent custody of the agency earlier in 2025." (Journal entry, Jan. 12, 2026.)

{¶ 40} A review of the record confirms there was clear and convincing evidence to support the above-findings of the juvenile court. At the time of trial, J.B. was just under four months old. Although J.B. was not old enough to express her wishes, the GAL recommended that it was in J.B.'s best interest to be committed to the agency's permanent custody unless it could be demonstrated at trial that Mother was "currently participating in case plan services" and making progress toward reunification. (GAL Report, Oct. 31, 2025.) The evidence at trial demonstrated that Mother was not making progress toward reunification or taking her case plan services seriously, and as a result, the GAL affirmed her permanent custody recommendation.

{¶ 41} Furthermore, Mother does not have stable housing and alleged father has not provided any care for J.B. The agency has been working Mother since 2024, and Mother continues to have issues with achieving and maintaining sobriety, mental health, housing, and anger management. Mother was referred to substance abuse and mental health centers on the other sibling's case. Mother did not complete any of the programs, which ultimately resulted in the permanent custody

placement of J.B.'s older sibling in early 2025.  Similarly, in this case, Mother was referred to substance abuse and mental health centers and has neither meaningfully engaged or completed the services.  Additionally, Mother has no sobriety date and stated that it was a struggle for her to be in her apartment building because of the temptation to use drugs.  Lastly, testimony established that J.B. was in agency custody since she was two days old, is well bonded with her foster family, and thriving.

{¶ 42} In light of the foregoing, we find that there is clear and convincing evidence in the record to support the juvenile court's determination that permanent custody to CCDCFS is in J.B.'s best interest.  Accordingly, we find that the court's decision to grant permanent custody to CCDCFS is not against the weight of the evidence as Mother contends, and Mother's single assignment of error is overruled.

{¶ 43} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

LISA B. FORBES, P.J., and
EMANUELLA D. GROVES, J., CONCUR